*E-FILED - 3/8/12*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL D. O'HAIRE,<br><br>    Plaintiff,<br>  v.<br><br>NAPA STATE HOSPITAL, et al.,<br><br>    Defendants. | No. C 09-2508 RMW (PR)<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(Docket No. 87) |

Plaintiff filed a pro se civil rights action pursuant to 42 U.S.C. § 1983 against employees of Napa State Hospital ("NSH"). NSH defendants have moved for summary judgment. Plaintiff has filed an opposition, and defendants have filed a reply. Having carefully considered the papers submitted, the court hereby GRANTS defendants' motion for summary judgment for the reasons set forth below.

### BACKGROUND[1]

Plaintiff is a civilly committed patient at NSH after being adjudicated not guilty by reason of insanity. (Compl. at ¶ 2.) Defendant Linda Howard ("Howard") is the Program Director at NSH. (Decl. Howard at ¶ 1.) She was the Acting Program Director from February

---

[1] The following facts are undisputed unless otherwise indicated.

1  2008 through November 2008, and then Program Director from November 2008 through June
2  2009. (Id.) Defendant Debbie Weakley ("Weakley") is the Nursing Coordinator at NSH. (Decl.
3  Weakley at ¶ 1.) She was employed at NSH as the Unit Supervisor, Nursing Coordinator, and
4  Program Assistant from January 2008 through June 2009. (Id.)

I.  Medical History and Treatment

Plaintiff's complaint alleges that from January 2008 through June 2009, defendants failed to properly address and treat his pain in his lower back/hip and right calf; nausea and weight loss; complications with his colonoscopy; a boil on his left buttock; sleep deprivation; Hepatitis C+, and need for pain management. (Decl. Ritsick at ¶ 7.)

A.  Lower back/hip and right calf pain

In January 2008, plaintiff suffered lower back pain. (Compl. at ¶ 6.) It stopped after a period of time, and then plaintiff experienced increasing severe pain on the right side of his body. (Id.) On January 30, 2008, Dr. Chow opined that plaintiff had a pulled muscle, and prescribed a pain reliever. (Id. at ¶ 7.) The following day, due to a mix-up, the pharmacy discontinued the prescription. (Id.) On February 10, 2008, after plaintiff spoke with several people about his pain, they told plaintiff they had experienced similar pain, and it was determined to be sciatic nerve pain. (Id. at ¶ 11.) Dr. Chow continued to say he did not know why plaintiff was experiencing pain. (Id.) On February 13, 2008, plaintiff had an x-ray, and the technician told him that plaintiff's condition was very similar to the sciatic nerve pain the technician was currently experiencing. (Id.) Plaintiff continued to experience pain and requested a medical neglect investigation on Dr. Chow. (Id. at ¶ 14.) On February 28, 2008, a neurologist diagnosed plaintiff with a pinched nerve which was causing the sciatic pain, and asked if plaintiff would consider surgery. (Id. at ¶ 16.) On May 27, 2008, plaintiff was taken to get orthopedic stockings for his swollen right calf. (Id. at ¶ 50.) Plaintiff was told he could not get more than one pair because budget issues only permitted one pair per patient. Plaintiff met with Weakley, Unit Supervisor, who told him that Susan Kessler wanted pictures of plaintiff's right calf and ankle, but then Weakley told him that the Unit nor Howard had any cameras. (Id. at ¶ 42.) Plaintiff told Weakley again that neither the Unit nor Program Management have done

anything about the infirm medical and treatment conditions even though they were aware of it. (Id.) From February 2008 through June 2009, plaintiff received pain relievers for several different types of medications designed to alleviate his pain (Decl. Ritsick at ¶¶ 13-14, 19, 22, 25, 27-29, 32, 35, 36); x-rays and physical therapy (id. at ¶¶ 15-20, 24, 25, 28-29, 32-33, 36); an MRI (id. at ¶ 23); and was referred to, and seen by specialists (id. at ¶¶ 24, 26, 27, 30-31, 33, 35).

      B.      <u>Nausea and weight loss</u>

Plaintiff also complained about nausea and weight loss, however, he had been working with NSH staff to lose weight because he was considered obese. (Decl. Ritsick at ¶ 37.) Plaintiff was advised to follow a diet, and exercise to control his weight. (Id. at ¶¶ 38-43.) Plaintiff complained of nausea due to one of his pain medications, and NSH staff decreased the prescription. (Id. at ¶ 40.)

      C.      <u>Colonoscopy</u>

On February 7, 2008, plaintiff was scheduled to undergo a colonoscopy for removal of an inflammation in plaintiff's colon. (Compl. at ¶ 10.) That appointment was cancelled. (Id.) On March 21, 2008, plaintiff asked Nurse Cowart to contact Howard again about initiating a medical neglect investigation regarding Dr. Chow's handling of plaintiff's conditions and delays in receiving second colonoscopy. (Compl. at ¶ 27.) Cowart said that he emailed Howard, but plaintiff never heard from Howard. (Id.) On August 21, 2008, plaintiff was told that at 4:00 p.m., he was to no longer have solid foods to prep for his colonoscopy the following morning. (Id. at ¶ 80.) Plaintiff was also given a prescription laxative solution to finish that was supposed to clear the bowels for surgery. (Decl. Ritsick at ¶ 51.) Plaintiff did not finish the solution. The following day, the surgeon told him that his bowel preparation was poor, and that he needed to schedule another colonoscopy. (Id. at ¶ 52; Compl. at ¶ 80.) This meant another discontinuation of pain medications to account for the procedure. (Id.) On August 26, 2008, plaintiff met with his treatment team with Weakley in attendance, where plaintiff was blamed for the poor bowel preparation. (Id. at ¶ 82.) The next day, plaintiff asked Patients Rights Advocate Susan Kessler to proceed with filing a complaint against Weakley for her improper statements. (Id. at ¶ 83.)

1 Plaintiff was rescheduled for a colonoscopy on October 10, 2008, which was successfully
2 completed. (Decl. Ritsick at ¶¶ 52, 54.)

   D.  Boil

   On February 28, 2008, a neurologist examined a boil on plaintiff's left buttock, and remarked that if it did not go down, it might need antibiotics. (Compl. at ¶ 16.) Between March and July 2008, NSH doctors assessed and prescribed two rounds of antibiotic treatment for the boil. (Decl. Ritsick at ¶¶ 60, 62, 66-67, 69.) On May 1, 2008, Dr. Chow examined plaintiff's boil. (Compl. at ¶ 38.) Dr. Chow said it looked like a chronic problem and said he would write a referral to the surgeon to have it removed. (Id.) On May 5 and May 6, 2008, plaintiff was seen by a neurologist, and his boil was discharging blood again. (Id. at ¶ 42.) On May 9, 2008, Weakley told plaintiff that his appointment to remove the boil had been cancelled, and plaintiff would be taken at a later date to a surgeon at the Queen of the Valley hospital, and also gave him several other appointment dates. (Id. at ¶ 43.) On May 20, 2008, plaintiff's boil was bleeding again. (Id. at ¶ 47.) On July 17, 2008, NSH staff took plaintiff to the surgical clinic to assess his boil, and the doctor determined that the boil had healed and surgery was unnecessary. (Decl. Ritsick at ¶ 70.) Plaintiff suffered no recurrences. (Id.)

   E.  Sleep deprivation

   From January 2008 through June 2008, NSH staff gave plaintiff two different medications to help him sleep because he was complaining of sleep deprivation. (Decl. Ritsick at ¶ 72.) In June 2008, plaintiff's prescription for an antidepressant that aided sleep was increased, and plaintiff's sleeping patterns improved. (Id. at ¶¶ 73-74.) From June 2008 through June 2009, NSH staff continued to treat plaintiff's sleep issues with Restoril. (Id. at ¶ 74.)

   F.  Hepatitis C+

   In 2006, plaintiff tested positive for Hapatitis C+ antibodies. (Decl. Ritsick at ¶ 75.) An RNA test determines the amount of viral RNA in a person's blood in order to determine whether the virus is still present. (Id.) A low "viral load" number indicates that the virus has been cleared from the body. (Id.) In 2006 - 2008, plaintiff's viral load was low, indicating that the virus was undetectable and cleared from his body. (Id. at ¶ 76.) From February 2008 through

1  July 2008, plaintiff was asymptomatic for Hepatitis C+, and he needed no treatment or care for
2  it. (Id. at ¶ 78.)

3        G.     Pain management

4  On May 22, 2008, plaintiff asked for a pain management program from his inter-
5  disciplinary treatment planning team – Drs. Bleman, Bowyer, and Nurse Delma. (Compl. at ¶
6  49.) Dr. Blement referred plaintiff to a pain specialist, Dr. Poh. (Id.) On June 2, 2008, plaintiff
7  spoke with Weakley and told her that pain specialist, Dr. Poh, said NSH was unable to provide a
8  pain management group. (Id. at ¶ 55.) Plaintiff asked her to contact Howard to request a
9  medical neglect investigation and asked for a written response. (Id.) Weakley said she would
10 email Howard, but Howard did not contact plaintiff. (Id.) On June 4 and June 19, plaintiff
11 complained to Weakley again regarding infirm medical treatment. (Id. at ¶¶ 56, 62.) She again
12 stated that she would email Howard. (Id.) Plaintiff was scheduled for a variety of group
13 therapies each week. (Id. at ¶¶ 61, 67.)

14 II.     Our Café History

15 On February 7, 2008, plaintiff requested a vacation from defendant Ken Wright
16 ("Wright"), Director of Our Café, based upon the severity of plaintiff's pain. (Compl. at ¶ 9.)
17 Wright told plaintiff that NSH was experiencing a budget shortfall, which precluded disabled
18 employees from receiving paid vacations for the foreseeable future. (Id.) In March 2008,
19 plaintiff requested a two week vacation, but was told by Wright and Gardner Carlson, On the Job
20 Training Program, that they needed time to consider the request because NSH had an insufficient
21 budget which precluded paid vacations at that time. (Id. at ¶¶ 24, 26.) Wright told plaintiff that
22 he could take a 2-day vacation, but that was it. (Id. at ¶ 26.)

23 On April 9, 2008, plaintiff spoke with Wright about the cessation of having paid vacation
24 time. (Id. at ¶ 36.) Wright said he would have to talk to the Acting Chief. (Id.) On May 1,
25 2008, Senior Manager Zapata started criticizing plaintiff's work and attitude. (Id. at ¶ 38.)
26 Plaintiff asked her what the procedure was for filing a complaint against her, and she directed
27 him back to his Unit. Plaintiff complained to the Acting Chief, and Wright. (Id.) Wright told
28 plaintiff to get a free soda and come back for a meeting the following day. (Id.) At the meeting

1  with Wright, Zapata, and Copple, plaintiff relayed that many employees had disputes with
2  Zapata, and that despite plaintiff's painful medical condition, he worked to the best of his ability.
3  (Id. at ¶ 39.)
4        In May and July 2008, plaintiff experienced work-related problems with Zapata and
5  Copple, and noticed that Zapata started using a more derogatory tone toward males. (Id. at ¶¶
6  42, 71.) On September 10, 2008, plaintiff told Zapata and Wright that he wasn't going to get any
7  better, and that his new PT schedule was in the middle of work hours so he would have to adjust
8  his work schedule. (Id. at ¶ 90.) Zapata told him that he would just lose hours. (Id.) Plaintiff
9  complained that he needed accommodations due to his medical condition, and Zapata told him
10 that he needed to either use sick hours or go on disability. (Id.)
11       In October 2008, plaintiff complained to Wright again that Zapata sent him home saying
12 "you're having a bad day; you should go home." (Id. at ¶ 104.) Plaintiff complained that he was
13 tired of being discriminated against by Zapata, referencing them as "them," or "make them do
14 it." (Id.) On October 29, 2008, Wright told plaintiff he and plaintiff should meet with the
15 treatment team. (Id. at ¶ 105.) The next day, plaintiff requested a lateral job transfer. (Id. at ¶
16 106.) That night, plaintiff had a team meeting in which he was informed that three managers
17 told them plaintiff had been aggressive. (Id.) On October 31, 2008, Wright told plaintiff he was
18 on immediate suspension with full pay until further notice. (Id. at 108.) On November 4, 2008,
19 during a team meeting, Wright said that for 6.5 years, plaintiff's work performance was
20 exemplary, but throughout 2008, he had been aggressive and that all three managers were afraid
21 of him. (Id. at ¶ 112.) In February 2009, plaintiff was told that Our Café was closing on March
22 31, 2009 because of financial problems. (Id. at ¶ 141.)

## ANALYSIS

24       Plaintiff claims that: (1) defendants Howard and Weakley failed to provide him adequate
25 medical care and were deliberately indifferent to his serious medical needs, in violation of his
26 Fourteenth and Eighth Amendment rights; (2) defendants Wright and NSH failed to provide
27 reasonable accommodations at Our Café for plaintiff's physical disability, in violation of the
28 Americans with Disabilities Act; and (3) defendant Wright retaliated against him for his

opposition to unlawful employment practices in violation of Title VII of Civil Rights Act. Defendants move for summary judgment, arguing that they are entitled to judgment as a matter of law because there are no genuine issue of material facts in dispute.

I.     <u>Standard of Review</u>

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. <u>Id.</u>

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Cattrett</u>, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson</u>, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. <u>Id.</u> If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." <u>Celotex Corp.</u>, 477 U.S. at 323.

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.Rmw\CR.09\Ohaire508msj.wpd     7

II.     Plaintiff's Claims

      A.     Medical needs

Plaintiff asserts that he was not provided adequate medical care, and NSH staff was deliberately indifferent to his medical needs. Plaintiff believes that Howard and Weakley are liable for these violations.

"Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982). Under the Due Process Clause of the Fourteenth Amendment, civilly-committed persons retain substantive liberty interests, which include at least the right to basic necessities such as adequate food, shelter, clothing and medical care; safe conditions of confinement; and freedom from unnecessary bodily restraint. Id. at 315-16. The court must only make certain that professional judgment in fact was exercised in making the pertinent decision. Id. at 321-22. "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323. Courts undertaking this inquiry are restricted to two questions: "(1) whether the decisionmaker is a qualified professional entitled to deference, and (2) whether the decision reflects a conscious indifference amounting to gross negligence, so as to demonstrate that the decision was not based upon professional judgment." Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992).

Viewing the evidence in the light most favorable to the plaintiff, there is an absence of evidence that the treatment decisions regarding plaintiff's care from January 2008 through June 2009 was a substantial departure from accepted professional judgment. Plaintiff does not dispute the accuracy of the extensive records submitted by defendants. Nor does plaintiff assert that NSH staff are not "qualified professionals." Based on the evidence submitted by defendants, there is an absence of evidence that the decisions made regarding plaintiff's medical treatment was a "conscious indifference amounting to gross negligence." Defendants set forth evidence

that the treatment decisions made by NSH staff were within the normal standard of care for people with plaintiff's medical conditions. (Decl. Ritsick at ¶¶ 84-85.) Further, plaintiff submits no evidence in support of his claim that the treatment decisions of NSH staff were outside the scope of professional judgment or that the decisions that were made were not presumptively valid. Plaintiff's general accusations against individual non-defendant doctors are not enough in themselves to show that professional judgment was novexercised, especially given the extent of plaintiff's medical records demonstrating the amount of treatment and care that he did receive within the challenged period. There is no genuine issue of material fact on this record, as a matter of law, that indicates that NSH staff acted with such a departure from professional standards that they could not have been based on professional judgment. See Youngberg, 457 U.S. at 321-22.

With regard to plaintiff's allegation that defendants and NSH staff exhibited deliberate indifference to his serious medical needs, the result is the same. Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. See McGuckin, 974 F.2d at 1059. A "serious" medical need exists if the failure to treat a prisoner's condition could result in "unnecessary and wanton infliction of pain." Id. at 1059 (citing Estelle, 429 U.S. at 104). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The defendant, however, must purposefully ignore or fail to respond to plaintiff's pain or medical needs. See McGuckin, 974 F.2d at 1060. Plaintiff must allege that, subjectively, defendants had a "sufficiently culpable state of mind" when they refused medical care. Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002) (quoting Wallis v. Baldwin, 70 F.3d 1074, 1076 (9th Cir. 1995)). Defendant must "both be aware of the facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Thus, an inadvertent failure to provide adequate medical care, mere negligence or medical malpractice, a mere delay in medical care (without more), or a difference of opinion over proper medical treatment, are all insufficient to constitute an Eighth Amendment violation. See Estelle, 429 U.S. at 105-07.

Viewing the evidence in the light most favorable to the plaintiff, plaintiff has tendered no competent evidence demonstrating that the course of treatment chosen for him was medically unacceptable under the circumstances, see Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004). See, e.g., Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not constitute cruel and unusual punishment."); Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of fact because he has not shown that he has any medical training or expertise upon which to base such an opinion."). In this regard, plaintiff's disagreement with NSH staff as to the appropriate course of diagnosis and treatment, without more, is insufficient to survive defendants' motion for summary judgment. At most, plaintiff's allegations amount to negligence. However, a claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment. See Toguchi, 391 F.3d at 1060-61. Moreover, in light of the extensive medical records and undisputed evidence set forth by defendants, plaintiff has failed to demonstrate that there was an{ purposeful act or failure to act in treating plaintiff's conditions. See McGuckin, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.").

More importantly, defendants are granted summary judgment on a more basic premise – lack of causation. Liability may be imposed on an individual defendant under 42 U.S.C. § 1983 if the plaintiff can show that the defendant proximately caused the deprivation of a federally protected right. See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988). A person deprives another of a constitutional right within the meaning of § 1983 if he does an affirmative act, participates in another's affirmative act or omits to perform an act which he is legally required to

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.Rmw\CR.09\Ohaire508msj.wpd        10

do, that causes the deprivation of which the plaintiff complains. See id. at 633. The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. Id. at 633. To defeat summary judgment, sweeping conclusory allegations will not suffice; the plaintiff must instead "set forth specific facts as to each individual defendant's" actions which violated his or her rights. Id. at 634.

Howard and Weakley are the only properly served and named defendants subject to liability for this claim.

As the Program Director, Howard's duties did not allow her to make medical decisions regarding patients. (Decl. Howard at ¶ 2.) If there were problems in any of the units in Howard's program, Howard or her Program Assistant investigated the problem and attempted to find a solution. (Id. at ¶ 4.) After investigation, Howard or the Program Assistant would refer complaints to the appropriate party for action, such as the supervising doctors, supervising psychiatrists, unit supervisors, or Executive Director if Howard believed she could not resolve the complaint. (Id.) Regarding complaints about medical care, if Howard or her Program Assistant was unable to resolve it, her normal course of action would be to refer the complaints to the Nursing Coordinator, Nursing Administrator, and/or the Medical Director. (Id. at ¶ 5.) Plaintiff's only allegations linking Howard to his claim were that he asked NSH staff to contact Howard to begin a "medical neglect investigation" and never heard from Howard (Compl. at ¶¶ 14, 27, 55, 56, 81), and that he sent an "Indexed Packet" to Howard and was told that she would meet with him regarding his claims of infirm conditions (Id. at ¶ 5). Here, all that plaintiff has shown is that NSH staff informed him that they would alert Howard as to plaintiff's claims, and Howard has not personally responded to him.[2] Even assuming that plaintiff's medical care was

---

[2] Plaintiff's unverified, bald, and conclusory statement disputing Howard's assertion that she or her program assistant investigated plaintiff's claims is not sufficient to establish a genuine issue of material fact. (Opp. at ¶ 24.) See Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001); see also Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005) (in equal protection case, conclusory statement of bias not sufficient to carry nomoving party's burden). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there

deficient in some manner, plaintiff has not provided evidence that Howard participated in, directed, or knew about alleged wrongful conduct and failed to stop it. See, e.g., Leer, 844 F.2d at 634 (concluding that summary judgment was proper because the prisoners failed to allege facts that demonstrated that the defendant was the actual and proximate cause of any constitutional violation).

To the extent plaintiff means to sue Howard based her supervisory role, that claim also fails. A supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011); Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc). A supervisor therefore generally "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). "It has long been clearly established that '[s]upervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others.'" Preschooler II v. Davis, 479 F.3d 1175, 1183 (9th Cir. 2007) (citations omitted).

Here, there was not a sufficient causal connection between Howard's conduct and any constitutional violation. Moreover, the complaints plaintiff had were against medical staff, and there was no evidence that Howard was their supervisor, or that they were her subordinates. Finally, there was no evidence that Howard was responsible for the NSH medical staff's training or supervision, or that she acquiesced in any allegation of deprivation.

Thus, Howard is entitled to summary judgment on the ground that plaintiff has not

---

is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corporation Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Liberty Lobby, 477 U.S. at 252). Plaintiff has not satisfied his burden.

provided evidence from which a reasonable jury could find that she proximately caused the purported deprivation of his Eighth or Fourteenth Amendment rights.

Similarly, Weakley was a Unit Supervisor, Nursing Coordinator, and Program Assistant from January 2008 through June 2009.  (Decl. Weakley at ¶ 1.)  As Unit Supervisor, she oversaw the function of the unit, and if there were any issues arising involving unit staff or patients, Weakley's job was to investigate and attempt to resolve the issues.  (Id. at ¶ 4.)  As Nursing Coordinator, she administratively managed and supervised the nurses, and if there were issues involving the nursing staff, Weakley's job was to investigate and attempt to resolve the issues.  (Id. at ¶ 5.)  As the Program Assistant, Weakley was responsible for administrative tasks, as well as investigating patient complaints and attempting to resolve them or refer them to the Program Director or Office of Patient's Rights.  (Id. at ¶ 6.)  Plaintiff's only allegations regarding Weakley were:  (1) she told him there were no cameras in the unit available to take pictures of his leg (Compl. at ¶ 42); (2) she told him that an appointment had been canceled but would be rescheduled (id.); (3) she blamed him for poor bowel preparation prior to his colonoscopy (id. at ¶ 82); (4) she recommended his transfer to a different unit (id. at ¶¶ 156-57); and (5) she emailed Howard regarding pain management groups and "infirm medical conditions" (id. at ¶¶ 55, 56).  Again, plaintiff has not provided evidence that Weakley participated in, directed, or knew of any alleged wrongful conduct and failed to stop it.[3]  See, e.g., Leer, 844 F.2d at 634.

Again, to the extent plaintiff means to sue Weakley based her supervisory role, that claim also fails.   The complaints plaintiff had were against medical staff, and there was no evidence that Weakley was their supervisor, or that they were her subordinates.  Finally, there was no evidence that Weakley was responsible for the NSH medical staff's training or supervision, or that she acquiesced in any allegation of deprivation.

Thus, Weakley is entitled to summary judgment on the ground that plaintiff has not provided evidence from which a reasonable jury could find that she proximately caused the

---

[3] In his unverified opposition, plaintiff discusses in more detail, Weakley's involvement in plaintiff's transfer to a different unit.  (Opp. at ¶¶ 25-29.)  However, it appears that plaintiff is alleging facts to support a claim of retaliation, which is not properly before this court.

purported deprivation of his Eighth or Fourteenth Amendment rights.

Alternatively, defendants contend that even if they violated plaintiff's constitutional rights, they are entitled to qualified immunity. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. Id. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established . . . The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Although Saucier required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 553 U.S. 223, 236 (2009).

First, civilly committed persons have a clearly established liberty interest in "reasonably nonrestrictive confinement conditions." Youngberg, 457 U.S. at 324 (holding that civilly committed persons have a substantive due process right to "reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be requred by these interests"). Second, the right against deliberate indifference to a serious medical need has been clearly established. See Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002).

As discussed, the record does not show a violation of plaintiff's Fourteenth or Eighth Amendment rights. Even if a constitutional violation had been shown, defendants would prevail

1  on the second <u>Saucier</u> prong.  For the purposes of qualified immunity the official's conduct must
2  be viewed not as a broad general proposition, but in the context of the specific facts of the case.
3  <u>Saucier</u>, 522 U.S. at 202.
4        The specific facts of this case show that defendants knew that plaintiff had numerous
5  complaints about the way NSH was handling his medical conditions.  It is possible for a
6  reasonable prison official in defendants' positions to mistakenly, though reasonably, perceive
7  that the exposure of risk of harm to plaintiff was not so high, and that acting within the confines
8  of their job duties by investigating and referring the complaints to the appropriate officials, but
9  not doing more, was constitutionally permissible.  <u>See, e.g.</u>, <u>Estate of Ford v. Ramirez-Palmer</u>,
10 301 F.3d 1043, 1050-52 (9th Cir. 2002).  Thus, defendants are entitled to qualified immunity.
11       B.     <u>ADA</u>
12       Plaintiff claims that NSH and Wright failed to provide reasonable accommodations for
13 his physical disabilities while he was employed at Our Café, in violation of the ADA.
14 Specifically, plaintiff alleges that NSH and Wright refused to allow him to take short breaks
15 because of his sciatic pain, and when he mentioned that he would file a complaint against them,
16 he was suspended from work.  Defendants assert that NSH is immune from money damages, and
17 also that plaintiff fails to state a claim under Titles I, II, and III of the ADA.  Plaintiff concedes
18 that NSH is immune from money damages, but claims that NSH should be liable for declaratory
19 relief.  (Opp. at ¶ 32.)
20       "Title I of the ADA enables individuals who have suffered employment discrimination
21 because of their disabilities to sue employers for damages and injunctive relief in federal court."
22 <u>Walsh v. Nevada Dept. of Human Resources</u>, 471 F.3d 1033, 1036 (9th Cir. 2006) (citing 42
23 U.S.C. § 12117(a)).  No party disputes that NSH is immune from money damages under Title I.
24 <u>Walsh</u>, 471 F.3d 1036 ("State governments can invoke the Eleventh Amendment's guarantee of
25 sovereign immunity against Title I suits seeking money damages.") (citing <u>Board of Trustees of</u>
26 <u>the Univ. of Ala. v. Garrett</u>, 531 U.S. 356, 360 (2001)).  Thus, the claim against NSH for
27 damages is dismissed.
28       Defendants' assertion that plaintiff has no standing to sue NSH for prospective equitable

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.Rmw\CR.09\Ohaire508msj.wpd     15

relief is correct. See Walsh, 471 F.3d at 1037. In Walsh, a former employee sued a state agency and requested injunctive relief to force the Department to adopt and enforce lawful policies regarding discrimination based on disability. The Ninth Circuit held that because the employee no longer worked for the State or the Department, nor was she seeking re-employement, it was unlikely that she would benefit from an injunction requiring the anti-discriminatory policies she requested. Thus, concluded the Ninth Circuit, she had no standing to bring such a claim for relief. Id. Similarly, here, plaintiff was not employed at Our Café at the time he filed suit, nor was he seeking to be re-employed. This court agrees that plaintiff has no standing to bring a claim for prospective equitable relief.

Moreover, declaratory relief is unavailable. The Declaratory Judgment Act, 28 U.S.C. § 2201 (1993), "permits a federal court to declare the rights of a party whether or not further relief is or could be sought, and . . . declaratory relief may be available even though an injunction is not." Green v. Mansour, 474 U.S. 64, 72 (1985). "The district court, however, may grant declaratory relief only when there is an actual case or controversy; a declaratory judgment may not be used to secure judicial determination of moot questions." Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1514 (9th Cir. 1994). "Mootness is the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Id. at 1509 (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)). The constitutional "case or controversy" requirement allows the district court to grant relief in an action filed only if there is a "real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937). A declaratory judgment thus may not be used to secure judicial determination of moot questions. See Blatchford, 38 F.3d at 1509. Here, Our Café terminated its operations on March 31, 2009, prior to the commencement of this action due to financial issues. Thus, any declaratory judgment against NSH for its alleged discrimination against plaintiff's disability as an employee of Our Café is no longer a real or substantial controversy. Nor does plaintiff's claim satisfy the two

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.Rmw\CR.09\Ohaire508msj.wpd           16

1 exceptions to the mootness doctrine of being "capable of repetition yet evading review," or
2 voluntary cessation. Cf. Blatchford, 38 F.3d at 1509-11. Thus, plaintiff's claim for declaratory
3 relief is against NSH is also denied.

4     Regarding Wright's liability under Title I, the Ninth Circuit has concluded that
5 "individual defendants cannot be held personally liable for violations of the ADA." Walsh, 471
6 F.3d at 1038. Thus, defendants are entitled to summary judgment as to plaintiff's Title I claim.

7     Title II of the ADA, 42 U.S.C.§ 12101 et seq., provides that "no qualified individual with
8 a disability shall, by reason of such disability, be excluded from participation in or be denied the
9 benefits of the services, programs, or activities of a public entity, or be subjected to
10 discrimination by any such entity." 42 U.S.C. § 12132. However, plaintiff's claim against NSH
11 and Wright must be dismissed under Title II because Title II does not apply to employment. See
12 Zimmerman v. Oregon Dept. of Justice, 170 F.3d 1169, 1173 (9th Cir. 1999).

13     Under Title III of the ADA, "[n]o individual shall be discriminated against on the basis of
14 disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages,
15 or accommodations of any place of public accommodation by any person who owns, leases (or
16 leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). However, Title
17 III is also inapplicable to employment discrimination. See Parker v. Metropolitan Life Ins. Co.,
18 121 F.3d 1006, 1115 (6th Cir. 1997) (holding "the statutory framework of the ADA expressly
19 limits discrimination in employment practices to Title I of the ADA"); Gardner v. Pediatrix
20 Medical Group, No. 09-1325 MMC, 2009 WL 2394368 (N.D. Cal. 2009); Motzkin v. Trs. of
21 Boston Univ., 938 F. Supp. 983, 996 (D. Mass. 1996) (holding "Title III does not apply to
22 employment discrimination"); see also Weyer v. Twentieth Century Fox Film Corp., 198 F.3d
23 1104, 1114 (9th Cir. 2000) (noting "[w]e see no reason why the rationale of Zimmerman," in
24 which Ninth Circuit held Title II of ADA inapplicable to "employment," would not "apply
25 equally to Title III [of the ADA]").

26     Thus, defendants are entitled to summary judgment on plaintiff's ADA claim.

27     C.    Title VII of the Civil Rights Act

28     Finally, plaintiff claims that Wright retaliated against him for his opposition to the

unlawful employment practices at Our Café, in violation of Title VII of Civil Rights Act.[4] Defendants argue that plaintiff fails to state a claim under Title VII because it prohibits employment discrimination only on the basis of race, color, religion, sex, or national origin, and plaintiff does not allege as such. See 42 U.S.C. 2000e-2(a). Because plaintiff only alleges that Wright engaged in unlawful employment practices by discriminating against plaintiff because of his disability, plaintiff's Title VII claim fails to state a cognizable claim. Defendants are entitled to summary judgment on this claim.

## CONCLUSION

The court concludes that plaintiff has failed to raise a genuine issue of material fact as to his allegations of violations of the Eighth and Fourteenth Amendments, the ADA, and Title VII of the Civil Rights Act, and that defendants are entitled to judgment as a matter of law. Accordingly, defendants' motion for summary judgment is GRANTED. The clerk shall terminate all pending motions, enter judgment for the defendants, and close the file.

IT IS SO ORDERED.

DATED: _____

RONALD M. WHYTE
United States District Judge

---

[4] Plaintiff appears to have abandoned this claim in his opposition by failing to address it.

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

PAUL D. O'HAIRE,

        Plaintiff,

  v.

NAPA STATE HOSPITAL, ET AL. et al,

        Defendant.

Case Number: CV09-02508 RMW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 8, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Paul D. O'Haire
Unit T-6
Napa State Hospital
2100 Napa-Vallejo Highway
Napa, CA 94558-6293

Dated: March 8, 2012

                                Richard W. Wieking, Clerk
                                By: Jackie Lynn Garcia, Deputy Clerk